UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GERRY MCDADE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 14 cv 1500 |
| | ) |
| v. | ) (Consolidated with Case No. 14-cv-8758) |
| | ) |
| YRC WORLDWIDE, INC. a.k.a. YRC, INC., | ) |
| | ) Magistrate Judge Susan E. Cox |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

For the reasons discussed herein, Defendant's Motion for Summary Judgment [73] is granted.

**I. Factual Background**

These consolidated cases allege racial discrimination that occurred at the Bolingbrook, Illinois terminal operated by Defendant YRC Worldwide, Inc. ("YRC" or "Defendant").[1] YRC is a "less-than-truckload carrier that provides transportation and delivery services." (Dkt. 78 at ¶ 1.)[2] YRC's Bolingbrook terminal opened on February 18, 2007, and employs a number of combination driver/dockworkers ("combo drivers"); all of the Plaintiffs in this case were combo drivers at the Bolingbrook terminal. (Dkt. 78 at ¶ 3.) Broadly speaking, the Plaintiffs' operative complaint alleges that YRC discriminated against African American and Hispanic employees in

---

[1] Case No. 14-cv-1500 has a single plaintiff, Gerry McDade. Case No. 14-cv-8758, which was consolidated with the *McDade* case, has the following plaintiffs: Craig Allen, Darius Prince, David Neal, Derrick Rias, Eddie Williams, Karl Harris, Ricardo Lazcano, Rickie Lockett, Thomas Jackson, Victor Trinidad, James Williams, Johnny Williams, Rudolph Timmons, and Joel Johnson.

[2] The Court cites, where possible, to the Plaintiffs' response to YRC's statement of material facts. Plaintiffs failed to comply with Local Rule 56.1 in several respects. First, Plaintiffs did not supply "a statement…of any additional facts that require the denial of summary judgment" pursuant to Local Rule 56.1(b)(3)(C). Of course, this is optional, and it is possible that Plaintiffs did not feel they needed to proffer additional facts in order to defeat the instant motion. However, Local Rule 56.1 also requires a response to each of the moving party's statements of fact, with "specific references to the affidavits, parts of the record, and other supporting materials relied upon" in the case of any disagreement. L.R. 56.1 (b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). In this case, Plaintiffs frequently stated they had "no response" to YRC's statement of material facts. (See generally Dkt. 78.) As per Local Rule 56.1, the Court considers any fact to which the Plaintiffs failed to respond as admitted.

several ways.[3] First, Plaintiffs allege that YRC discriminated against them by giving them more difficult driving assignments. Specifically, African American and Hispanic drivers were assigned to "city" routes Plaintiffs allege are more dangerous, stressful, and likely to cause accidents because the large trucks Plaintiffs drove were difficult to maneuver in denser, urban areas; meanwhile, white drivers were assigned "suburban" routes that were relatively safer and easier. (Allen Compl. at ¶ 77.) Additionally, Plaintiffs had to unload the heaviest and worst loads on the docks, while white drivers were not assigned to the docks or allowed to refuse dock work during difficult loads. (Allen Compl. at ¶ 82.) Second, Plaintiffs allege they received harsher discipline than white drivers at YRC; the complaint focuses primarily on threats of discipline any time Plaintiffs tried to refuse a load or an assignment they did not want. (Allen Compl. at ¶¶ 78-80, 84.) Third, Plaintiffs allege they were given trucks that were in a state of disrepair, whereas white drives were given fully functioning trucks. (Allen Compl. at ¶ 85.) Finally, Plaintiffs allege they were "subjected to a racially hostile working environment" in the form of "inappropriate and hurtful racial stereotypes." (Allen Compl. at ¶ 86.)

On September 24, 2010, a group of combo drivers wrote and signed a petition (the "2010 Petition") that outlined several complaints regarding work assignments; specifically, the petition complained that minority combo drivers were regularly assigned city routes, while white combo drivers were dispatched to suburban routes. (Dkt. 78 at ¶¶ 48-49.) YRC investigated these allegations, but the parties disagree on the validity of the results of that investigation and the results are not particularly relevant to the instant motion. (Dkt. 78 at ¶¶ 50-53.) Each of the Plaintiffs filed a charge alleging race discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights, and the EEOC issued each of them a Notice of Right to Sue. (Allen Compl. at ¶¶4-31.) Plaintiffs filed

---

[3] Because all of the Plaintiffs who are the subject of YRC's motion are named in the *Allen* case, the Court only focuses on the allegations included in that Complaint.

the Complaint relevant to the instant motion on February 13, 2015, alleging two causes of action: 1) violations of 42 U.S.C. § 1981, and 2) violations of Title VII.

The two cases currently before the Court were consolidated on the Plaintiffs' motion, with YRC's consent, pursuant to Federal Rule of Civil Procedure 42 and Local Rule 40.4 Dkt. 23.) However, this case is not a class action; each of the named Plaintiffs brings his claim in his individual capacity. As such, each Plaintiff has the burden of proving the allegations outlined above in order to prevail on his claims. The parties consented to this Court's jurisdiction on July 17, 2015. (Dkt. 38.) Defendant then filed a motion for summary judgment against four plaintiffs: Eddie Williams, Jr. ("Williams"), Karl Harris ("Harris"), Thomas Jackson ("Jackson"), and Derrick Rias ("Rias") (collectively, the "Summary Judgment Plaintiffs"). The Court has combed through the record, and lays out the relevant material facts for each of the Summary Judgment Plaintiffs below.

**A.    Williams**

Williams is an African American man who worked as a combo driver at the Bolingbrook terminal from its opening in February 2007 until October 2015, when he moved to YRC's Chicago Heights terminal. (Allen Compl. at ¶ 36; Dkt. 78 at ¶¶ 57-58.) For the first three years he was at the Bolingbrook terminal, Williams worked the 2 a.m. shift, but began bidding on the 8 a.m. shift when the Bolingbrook terminal expanded its coverage area to include new routes.[4] (Dkt. 78 at ¶¶ 59-60.) Williams was assigned to the 8 a.m. shift and was given the Melrose Park

---

[4] The Bolingbrook terminal had morning shifts (starting from 6 a.m. to 10 a.m.), afternoon shifts (starting from 2 p.m. to 5 p.m.) and late morning and late night shifts (start times of 11 a.m. or 2 a.m.); different shifts had different allocations between dock work and driving work. (Dkt. 78 at ¶ 23.) Drivers could bid on the shift they wanted, but dock supervisors and dispatchers were responsible for assigning specific routes to the combo drivers at the Bolingbrook facility. (Dkt. 78 at ¶¶ 14-15, 18.) Summary Judgment Plaintiffs point out in their response to YRC's statement of material facts that the Collective Bargaining Agreement between Plaintiffs' union and YRC states that "[a]nnually during the month of March the drivers shall select job assignments and shifts by order of seniority which bid shall be permanent for that year." (Dkt. 78 at ¶ 18; Dkt. 74-3 at 36.) To the extent YRC was not following the procedures for work assignments detailed in the Collective Bargaining Agreement, Plaintiffs may have a cause of action under labor laws, but that fact is not relevant to the issues presently before the Court.

run (presumably a "suburban" route) for several months, but that route was later reassigned to a white combo driver. (Dkt. 78 at ¶ 63.) After Williams lost the Melrose Park run, he did not have a particular route he would drive, and would perform whatever assignments were available to him. (Dkt. 78 at ¶ 64.) Eventually, Williams took the Cicero run, which was a "city" run; Williams maintains he took the Cicero run because he had become dissatisfied with the random work assignments he was given by his supervisor, Chris Zurales, after losing the Melrose Park run. (*Id.* at ¶ 65.) Williams testified that the previous driver on the Cicero run struggled with the run and had "a few" accidents while performing it, but he was unsure how many had occurred; Williams did not have any accidents while performing the Cicero run. (Williams Dep. 31:18-21, 35:11-17, June 30, 2016.) For the remainder of his time working at the Bolingbrook terminal, Williams performed the Cicero run. (Dkt. 78 at ¶ 66.)

Williams testified that he did not believe he was disciplined in a discriminatory manner. (*Id.* at ¶ 78.) He further testified he did not believe YRC assigned him specific trucks due to his race. (*Id.* at ¶ 74.) Williams stated he never heard any racially offensive language directed toward him while working at the Bolingbrook terminal. (*Id.* at ¶ 77.) The only time he heard any racially offensive language was when a white combo driver called a Hispanic driver "chico." (*Id.* at ¶ 78.)

  **B. Harris**

Harris is an African American man who worked as a combo driver at the Bolingbrook terminal from its opening in February 2007 until October 2015, when he moved to YRC's Chicago Heights terminal. (Allen Compl. at ¶ 37; Dkt. 78 at ¶¶ 81-82.) For the first three years he was at the Bolingbrook terminal, Harris primarily did dock work, but also did some driving. (Dkt. 78 at ¶¶ 83.) However, Harris preferred driving to dock work, and bid for the 8:30 a.m. or 9:00 a.m. shift during his last five years at the Bolingbrook terminal, because those shifts

4

primarily consisted of driving work. (Dkt. 78 at ¶¶ 86-87.) Harris was assigned the Midway route (a city route), which he kept until he left the Bolingbrook terminal. (Harris Dep. 27:11-21.) Harris testified that the city routes were more difficult and dangerous than the suburban routes. (Dkt. 78 at ¶ 91.) Harris testified that the city routes would sometimes cause him to block traffic while making a delivery, which would lead to "semi arguments," but that these "semi arguments" never escalated into physical altercations. (Harris Dep 29:9-30:9, July 7, 2016.) During his time driving from the Bolingbrook terminal, Harris was involved in two accidents. One was on a city route, but Harris testified that the accident was his fault for being "careless;" the second accident occurred on a suburban route. (Dkt. 78 at ¶94.)

Harris was happy with the tractors he was assigned. (Dkt. 78 at ¶ 99.) On a number of occasions, Harris saw white drivers refuse to take certain loads. (Dkt. 78 at ¶¶ 100-101.) However, when African American or Hispanic drivers complained about a route or a load, they were asked if they were refusing their assignment; according to Harris, this is a significant question because refusing a load is tantamount to termination of employment with YRC. (Dkt. 78 at ¶ 101.) In other words, Harris considered this question to be a threat to his employment with YRC. Harris provided a lengthy recitation of the disciplinary records of white combo drivers, who Harris believes were disciplined less harshly than he was. (Dkt. 78 at ¶ 104.) However, other than being questioned about whether he was refusing a load, Harris has not provided any other disciplinary action he feels was discriminatory.[5] Harris testified he heard racially offensive language in the workplace "all the time," but noted that he was not personally offended by it. (Dkt. 78 at ¶ 113.)

---

[5] Oddly, the record shows Harris had a disciplinary record that included a two-day suspension and a notice of discharge, but Harris did not identify this discipline as discriminatory in his deposition or his brief in opposition to the instant motion. (*See* Dkt. 74-3 at 80-81.)

**C. Jackson**

Jackson is an African American man who worked as a combo driver at the Bolingbrook terminal from its opening in February 2007 until October 2015, when he moved to YRC's Chicago Heights terminal. (Allen Compl. at ¶ 40; Dkt. 78 at ¶¶ 115-117.) For the first three years he was at the Bolingbrook terminal, Jackson primarily did dock work, and eventually began doing some driving for YRC on shorter, suburban runs. (Dkt. 78 at ¶ 119.) In 2010, the Bolingbrook terminal expanded its coverage area to include new routes, and Jackson began to bid on (and receive) assignments for the 10 a.m. shift, which consisted primarily of driving work. (Dkt 78 at ¶¶ 120-121.) Jackson began with the Joliet East run (a suburban run), which was subsequently assigned to a white driver, Ron Santor, who had more seniority than Jackson. (Dkt. 78 at ¶ 122, Jackson Dep. 26:13-15, July 12, 2016.) Jackson was then assigned to the Oak Park run (a city route), which he kept until he left the Bolingbrook terminal in 2015. (Dkt. 78 at ¶ 122.) Jackson testified that the Oak Park run was more difficult, but did not claim it was more dangerous. (Dkt. 78 at ¶ 126.)

Jackson testified that Chris Zurales would look through the truck keys before handing them out to drivers, to ensure white drivers would be given trucks with air conditioning, whereas African American and Hispanic drivers would be given trucks with no air conditioning. (Dkt. 78 at ¶ 128.) He further testified that YRC updated its fleet in 2010 or 2011, after which every YRC driver was able to drive an air conditioned truck. (*Id.*)

Unlike Harris, Jackson was never asked if he was refusing a load, because he did not want to "test those waters," but he did claim white drivers were allowed to refuse loads, whereas minority combo drivers were not. (*See* Dkt. 78 at ¶ 132.) Jackson alleges minorities were told to get back to work during break times, but white combo drivers were not. (Dkt. 78 at ¶ 133.) Jackson further claimed that YRC's drug testing policy was discriminatory. In particular, he

believes minority combo drivers were tested more regularly than their white counterparts, and that he was required to wait outside the tester's office, while two unnamed white combo drivers were able to wait in the break room. (Dkt. 78 at ¶ 141.) Jackson did receive substantive discipline he claims was in retaliation for signing the 2010 Petition. (Dkt. 78 at ¶ 148). In November 2010, Jackson was suspended for 3 days for running a red light while operating a tractor. (Dkt. 74-3, Attachment E.) On March 16, 2011, Jackson was terminated for leaving his trailer unattended. (Dkt. 74-3, Attachment E.) He appealed the decision and the discipline was reduced to a three day suspension. (*Id.*)

On one occasion, Jackson claims a dispatcher told him "you're my bitch for the day" after giving him an assignment he did not want. Jackson testified he was called "homeboy" by a white combo driver "on a couple of occasions" at the Bolingbrook terminal, and that a supervisor may have heard the comment because it happened in the break room. (Jackson Dep. 129:12-17; Dkt. 78 at ¶ 143.) He could not recall any other racially insensitive language he heard at YRC. (Dkt. 78 at ¶ 144.)

**D.     Rias**

Rias is an African American man who worked as a combo driver at the Bolingbrook terminal from its opening in February 2007 until March 2015, when he was involved in an accident that led to his termination. (Allen Compl. at ¶ 35; Dkt. 78 at ¶¶ 149-50.) From 2007-2009, Rias worked the 4 a.m. shift, which typically began with dock work and ended with a mid-morning driving route. (Dkt. 78 at ¶ 151.) From 2009 until his termination in 2015, Rias did the Plainfield run (which also included stops in Romeoville and Bolingbrook); Rias testified he considered all of these areas to be suburban. (Dkt. 78 at ¶ 154.) However, on two occasions Rias was pulled off of the Plainfield run and it was reassigned to a white combo driver. (Dkt. 78 at ¶ 156.) Each of these episodes lasted a few months, and Rias was put onto city runs and "lift gate"

7

duty (a more difficult type of dock work) during those times. (Rias Dep. at 61:4-62:11.) Rias testified that on one run to the west side of Chicago, he had a gun pulled on him during a delivery. (Dkt. 78 at ¶ 161.)

Rias did not have any complaints about truck assignments. (Dkt. 78 at ¶ 164.) In his deposition, Rias recalled one instance where he believed the discipline he received was discriminatory; he received a warning letter for leaving his shift to pick up his sick son, despite receiving clearance from a supervisor to do so. (Dkt. 78 at ¶ 165.) Rias's disciplinary file includes several other suspensions and his eventual termination, but he did not identify any of these disciplinary actions as discriminatory.[6] (Dkt. 78 at ¶ 166.) Rias was also asked on several occasions whether he was refusing a load, similar to Harris. (Dkt. 78 at ¶ 167.)

Rias also identified several instances he believed were part of a hostile work environment at the Bolingbrook terminal.[7] A supervisor once asked Rias "what's the deal with chicken and waffles," to which Rias responded that he did not eat chicken and waffles. (Dkt. 78 at ¶ 171.) He also heard two white combo drivers refer to Hispanic drivers as "chico," and was called "boy" on another two occasions. (Dkt. 78 at ¶¶ 168-69.)

## II. Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette Indiana*, 359 F.3d 925, 928 (7th Cir. 2004). The

---

[6] Rias did testify that he believed the discipline he received was retaliatory, based on his signing of the 2010 Petition. (Rias Dep. 66:12-21, July 13, 2016.)
[7] However, Rias also identified other instances, but those occurred at a different YRC terminal, which is not part of the operative facts of the pleadings in this case. (Dkt 78 at ¶ 172.)

party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Cellotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Cellotex,* 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

## III. Discussion

### A. Prima Facie Case for Disparate Treatment

In order to establish a prima facie case for discrimination under a disparate treatment theory of liability, Plaintiffs have the initial burden of establishing that: 1) they were members of a protected class; 2) they performed reasonably on the job in accord with YRC's legitimate expectations; 3) they were subjected to an adverse employment action; and 4) similarly situated employees outside of their protected class were treated more favorably by YRC.[8] *David v. Bd. of Trustees of Community College Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). YRC argues that the Summary Judgment Plaintiffs have failed to create a genuine issue of material fact regarding the third and fourth elements listed above. For the reasons discussed herein, the Court agrees regarding Williams, Harris, and Jackson; as discussed further below, Rias has made out a prima facie case for disparate treatment, but failed to show the YRC's proffered reasons are

---

[8] The same standards govern liability under Title VII and 42 U.S.C. § 1981. *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1307 (7th Cir. 1985). As such, the Court will treat both causes of action together, and will use Title VII interchangeably with Section 1981.

pretext.

### 1. Adverse Employment Action

YRC argues that the adverse employment actions highlighted by Plaintiffs – namely, being given city routes and more difficult loads, being disciplined more harshly, and being given inferior trucks – do not rise to the level of adverse employment actions, as a matter of law. An adverse employment action must "materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Dass v. Chicago Bd. of Ed.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)) (internal quotations omitted). As such, the Seventh Circuit has listed three types of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy an and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id.* (quoting *Nichols v. S. Ill. University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). The Court will analyze each of the allegedly adverse employment actions below to determine whether they fit into the categories described above.

#### a. Routes/Loads

Plaintiffs have not argued that requiring African American and Hispanic combo drivers to

perform more difficult loads and drive city routes either diminished their financial terms of employment or that it reduced their career prospects. Instead, Plaintiffs allege that these job assignments were "more physically dangerous," more stressful, and that maneuvering the trucks was more difficult.[9] (Allen Compl. at ¶ 77.) To the extent the routes were more stressful or more difficult, that change would not constitute a materially adverse employment action sufficient to support a cause of action. *See, e.g.*, *Dass*, 675 F.3d at 1070 (plaintiff's belief that assignment was more difficult not a materially adverse employment action); *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (various events, including assignment to difficult cases, not adverse employment actions). The only potential allegation that could support a cause of action is that the city routes were more physically dangerous or more likely to cause an accident.

Of the Summary Judgment Plaintiffs, only Rias has provided any evidence to show the city routes were more dangerous or more likely to cause accidents. Williams testified he did not have any accidents while performing the Cicero run. Harris testified he sometimes had "semi-arguments" while performing deliveries on city routes, but did not claim to have ever been in any physical danger as a result of these incidents. (Harris Dep. at 29:9-30:9.) Of the accidents Harris had while working as a combo driver at the Bolingbrook terminal, one was on a city route and one was on a suburban route. With an equal number of accidents on both types of routes, this Court cannot say that Harris has provided any evidence to support an inference that the city routes were more dangerous or more likely to cause an accident. Jackson testified that his city run was more difficult, but did not state it was more dangerous. (Dkt. 78 at ¶ 126.)

---

[9] Although it is difficult to surmise because the argument presented in the brief in opposition consists primarily of a lengthy string of rhetorical questions, Summary Judgment Plaintiffs may be arguing that the route assignments were degrading or humiliating. However, Plaintiffs' Complaint does not allege any such facts, and it is inappropriate to attempt to shoehorn new allegations into a response to a motion for summary judgment. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment") (internal quotations omitted). Summary Judgment Plaintiffs also seem to argue that the route assignments somehow affected their seniority rights as union members; however, their brief fails to elucidate the Court on why that is true, and, in any event, that issue is also not raised anywhere in their Complaint.

However, Rias testified that on one run to the west side of Chicago, he had a gun pulled on him during a delivery. (Dkt. 78 at ¶ 161.) The Court believes this is sufficient evidence to create an inference, as to Rias's claims only, that the city routes were more dangerous and that being assigned to them was a materially adverse employment decision.

### b. Discipline

Disciplinary action may constitute an adverse employment action, depending on the circumstances. For example, a suspension without pay is considered an adverse employment action. *Russell v. Bd. of Trustees of the Univ. of Ill. at Chicago,* 243 F.3d 336, 341-42 (7th Cir. 2001). However, a written reprimand, without more, is not. *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (citing *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)). In the Seventh Circuit, the distinction appears to turn on whether the relevant disciplinary action is accompanied by "immediate consequence[s]" such as a loss of pay, "ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities." *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001); *see also, Russell*, 243 F.3d at 341-42. Here, the Summary Judgment Plaintiffs have not shown that the disciplinary action they have identified rises to the level of an adverse employment decision.

Williams testified that he did not believe he was disciplined in a discriminatory manner, so the Court need not deal with his claims on this front any further. Harris testified that he considered it a threat to his job when he was asked if he was refusing a load. However, Harris did not identify any tangible employment consequence that arose from this supposed threat, other than having to do the work YRC had hired him to do. He did not claim he lost out on any pay or opportunities stemming from supervisors asking him if he was refusing a load. The Court believes these threats, whether real or perceived, are more akin to the reprimand letter that the Seventh Circuit found was not an adverse employment action in *Kraus*e, than the five-day

suspension without pay in *Russell*.[10]

Jackson has provided evidence that might rise to the level of an adverse employment action; he was suspended on two separate occasions, as described above. However, Jackson testified he believed the disciplinary action YRC took against him was retaliation for his signing of the 2010 Petition. In other words, Jackson has provided evidence that he was disciplined for engaging in protected activity, which could form the basis for a claim for retaliation under Title VII. However, a claim for retaliation is substantively different than a claim for disparate treatment under Title VII, invoking a different statutory section and different elements to prove the claim. *Compare* 42 U.S.C. § 2000e-2, *with*, 42 U.S.C. § 2000e-3; *see*, *e.g.*, *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (elements for retaliation claim are: 1) engagement in protected activity; 2) materially adverse employment action; and 3) a causal connection between the two). The operative Complaint does not bring a cause of action for retaliation under Title VII. The record before the Court on this motion for summary judgment does not provide any evidence that demonstrates that the discipline Jackson cites was the result of his race. Again, while Jackson may have a cause of action for retaliation based on the Parties' summary judgment filings, that issue was not raised by Plaintiffs in this case, and is not properly before the Court.

The only disciplinary action that Rias claims was discriminatory is a warning letter he received for leaving his shift to pick up his son. As in *Krause*, a warning letter, without some sort of tangible adverse effect, is not sufficient to support a cause of action for disparate treatment. As such, Rias has also failed to prove that YRC subjected him to discipline that rises to the level of an adverse employment action.

---

[10] *Russell* is also distinguishable from the instant case; in that case, the Seventh Circuit found the suspension was accompanied by "a formal finding" in plaintiff's disciplinary record "that she 'falsified' her time records and committed 'theft of services,'" which a prospective employer performing a background check on the plaintiff "would surely hold [] against her when making employment related decisions." 243 F.3d at 341. No such allegations are made regarding the disciplinary actions taken in this case.

13

### c. Truck Assignments

As an initial matter, Rias, Harris, and Williams all testified that they either had no complaints about their truck assignments, or that they did not believe trucks were assigned on the basis of race. As for Jackson, he testified that Chris Zurales would hand out truck keys to ensure white drivers had trucks with air conditioning and minority drivers did not. Even if true, Plaintiff has not provided any evidence to show that this rises to the level of an adverse employment action. Jackson did not testify that he found the truck assignments degrading or dangerous. As such, the Court does not believe Jackson has provided sufficient evidence to show that the truck assignments rose to the level of an adverse employment action as a matter of law.

### 2. Similarly Situated Employees

The only remaining issue is whether Rias has provided sufficient evidence to show he was treated differently than other similarly situated white combo drivers when he was assigned city routes, instead of suburban routes. Rias testified he was taken off of the suburban Plainfield route on two occasions, and that his route was reassigned to a white combo driver who had less seniority than Rias, named Dave Okninski. (Dkt. 78 at ¶ 156.) The Court believes a reasonable juror could find Rias was treated less favorably than similarly situated white combo drivers when he was removed from the Plainfield run. *See Ortiz v. Werner Enter.*, 834 F.3d 760, 765 (7th Cir. 2016) (the legal standard in Title VII cases "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race…caused the discharge or other adverse employment action").

The Court does not find any of YRC's arguments to the contrary availing. First, YRC argues it is entitled to summary judgment because "Rias does not present any evidence that similarly situated Caucasian drivers were not occasionally pulled off their usual assignments." (Dkt. 75 at 20.) However, it is not necessary for Rias to show that no other white combo driver

suffered the same fate as Rias. While doing so would certainly satisfy this element, it is not the only lens through which similarly situated co-workers can be viewed. If Rias can show that some similarly situated co-workers (or perhaps even one) were treated in a manner more favorable than the way Rias was treated by YRC, he will satisfy this portion of the relevant test. Rias claims that a white co-worker was given an assignment Rias wanted, and Rias was then reassigned to harder, more dangerous work assignment; that is sufficient to meet this prong of the test. Again, this is a motion for summary judgment. Rias need not definitively prove a negative (*i.e.*, that no other white combo driver ever had a work assignment pulled from them) to support a reasonable inference that he was treated less favorably than his similarly situated co-workers. The Court believes he has met his burden to prove this element.

    **B.**    **Pretext**

After a Plaintiff has demonstrated a *prima facie* case for race discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer does so, the burden shifts back to the plaintiff to present evidence that the proffered reason is "merely pretext for unlawful discrimination." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). According to YRC, work assignments were doled out "based on a variety of business considerations, including the number of hours a driver had left available on a shift, the start time of a driver's shift, the volume of inbound freight on that day, customer delivery requirements, and what routes get a trailer unloaded most efficiently." (Dkt. 75 at 22.) As such, YRC has successfully articulated a legitimate business reason for the route assignments, and the burden shifts back to Rias to prove the aforementioned reasons were pretext.

Here, Rias falls short. In fact, Summary Judgment Plaintiffs' brief in opposition to the instant motion failed to present any argument at all on the issue of pretext. Other than conclusory

15

testimony that he believed it was racially discriminatory any time he was given a city route, Rias was not able to provide evidence to show the reasons described above were pretext. Rias testified that the first time he was pulled off the Plainfield run, he was told that "[YRC] can use [Rias] in the city." (Rias Dep. 59:6-11.) When Rias complained the second time he was taken off the Plainfield run, he was told it was because he was more familiar with the areas to which he was being reassigned. (Rias Dep. 60:21-61:2.) There is no evidence this is false, and, if true, they qualify as legitimate reasons to assign Rias to city runs. Rias did not testify that he was, in fact, less familiar with the routes to which he was assigned than Okninski, and there is no evidence to suggest as much. The closest Rias comes to presenting evidence of pretext is his testimony that Oknisnki had less seniority that him. However, the evidence in the record shows that seniority only gave combo drivers preference on their shifts,[11] not what specific route they would run within a shift, and, therefore does nothing to disprove YRC's proffered reasons for its route assignments.

### C. Hostile Work Environment

To survive summary judgment on a claim for hostile work environment, the Summary Judgment Plaintiffs must provide sufficient evidence to demonstrate that: (1) the work environment was both subjective and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe and pervasive; (4) that there is no basis for employer liability. *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 601 (7th Cir. 2014). In order to be actionable, the harassment in the work place must be so severe or pervasive as to alter the conditions of the Summary Judgment Plaintiffs' employment and create an abusive working environment. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 776 (1998)). "[I]solated incidents

---

[11] See *supra*, at n. 4.

(unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. "Factors in our assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003)).

As an initial matter, Harris testified he was not personally offended by the language he alleges he heard while working at the Bolingbrook terminal. Therefore, he has failed to demonstrate he found the environment subjectively offensive, and summary judgment should be granted on his claim. The other Summary Judgment Plaintiffs have not provided evidence to show that the alleged racial harassment was so severe and pervasive that it would affect the terms and conditions of their employment. Williams testified that racially offensive language was never directed toward him, but that he once heard a white combo driver call a Hispanic driver "chico."[12] Jackson testified that the only racially insensitive language he could identify was being called "homeboy" on a few occasions. He was also told "you're my bitch for the day" by a dispatcher. Rias said he was called "chico" by two white combo drivers and was called "boy" on two other occasions. Courts in the Seventh Circuit consistently hold that these types of sporadic, isolated incidents do not rise to the level of "severe or pervasive" that would support a cause of action under Title VII. *See Pierce v. Illinois Dept. of Human Servs.*, 355 Fed. Appx. 28, 31-32 (7th Cir. 2009) (two incidents, including flashing a KKK sign toward African American plaintiff and calling plaintiff "nigger," not severe or pervasive enough to support Title VII claim); *Patt v.*

---

[12] The Summary Judgment Plaintiffs also testified they heard racially charged comments directed toward other combo drivers. *See* Dkt. 78 at ¶111 (Chris Zurales made a comment to Gerry McDade that there was a pile of chicken bones in his truck), and ¶112 (Harris heard a driver say "big lip black people can kiss my ass"). However, the Seventh Circuit has noted that harassment directed at someone other the plaintiff is not as impactful as harassment directed at the plaintiff for purposes of Title VII. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004).

*Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-related comments too isolated to support Title VII claim); *Russell*, 243 F.3d at 343 (supervisor telling plaintiff that "intelligent women were unattractive" and referring to other female co-workers as "sleazy" or dressing "like a whore" not sufficiently severe or pervasive). In fact, courts in this Circuit have often found that language that is more offensive does not satisfy the "severe or pervasive" test for purposes of Title VII. *See Nichols*, 755 F.3d 594 (7th Cir. 2014) (comments, including calling plaintiff "black n---er" and "boy"); *Pierce*, 355 Fed. Appx. at 31-32; *Smith v. Northeastern Ill. Univ*, 388 F.3d 559, 566-67 (7th Cir. 2004) (calling plaintiff's co-workers "black motherfuckers" not sufficiently severe or pervasive); *see also*, *Adam v. Obama for America*, 210 F. Supp. 3d 979, 991 (N.D. Ill. 2016) (collecting cases). Additionally, Summary Judgment Plaintiffs have made no arguments regarding the aforementioned factors that would allow the Court to rule in their favor. Even if the Court did believe the alleged conduct was sufficiently frequent, they have not discussed whether the conduct was intimidating in any way, or how it affected their work performance.[13] As such, the Court does not believe the Summary Judgment Plaintiffs have created a genuine issue of material fact showing that the alleged harassment was so severe and pervasive as to affect the terms and conditions of their employment at the YRC Bolingbrook terminal. YRC's motion for summary judgment is granted on these claims.

**IV. Conclusion**

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted.

Entered: 9/13/2017

_____

U.S. Magistrate Judge, Susan E. Cox

---

[13] The same is true for some of the other activity Summary Judgment Plaintiffs might claim contributed to a hostile work environment, such as Jackson's allegations regarding drug testing and monitoring of his break times.